# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-CT-01149-SCT

*DEBORAH A. RICHARD*

*v.*

*EVERETT CLYDE RICHARD*

### ON PETITION FOR WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 10/19/95 |
| TRIAL JUDGE: | HON. WILLIAM H. MYERS |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM E. TISDALE |
| ATTORNEY FOR APPELLEE: | BRENT M. BICKHAM |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REINSTATED - 5/14/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/4/98 |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. This case comes to the Court on Petition for Writ of Certiorari filed by Everett Clyde Richard. The Jackson County Chancery Court granted Everett Richard a divorce from Deborah A. Richard on the ground of habitual cruel and inhuman treatment and awarded him custody of the couple's three minor daughters. The Court of Appeals denied the divorce finding that none of the acts complained of by Everett constituted grounds of habitual cruel and inhuman treatment and reversed and rendered. The Court of Appeals did not reach any other assignments of error on appeal. The petition for writ of certiorari was filed with this Court on November 19, 1997, and granted on January 22, 1998. The issue presented for certiorari review is whether the judgment of the Court of Appeals is contrary to *stare decisis* and a departure from the case law promulgated by this Court defining cruel and inhuman treatment. We find that the crux of Everett's complaint of cruelty lies more in the habitual, wrongful accusations of infidelity and incest rather than in physical abuse or fear of such. These accusations and proof thereof alone are extreme enough to constitute cruel and inhuman treatment. Further, when all the things complained of are viewed as a whole, keeping in mind the habitual nature of the acts, they amount to habitual cruel and inhuman treatment. We therefore find that the judgment of the Chancery Court of Jackson County, granting Everett a divorce on the ground of habitual cruel and

inhuman treatment should be affirmed.

## FACTS

**¶2.** Everett and Deborah Richard were married for the first time in August of 1978 and divorced in March of 1984. The couple remarried in December of 1986, and separated again in October of 1994. The couple has three minor daughters who were ages fourteen, twelve and ten at the time of the divorce hearing. The two older daughters both testified at the hearing and stated that they wished to live with their father.

¶3. At the time of the trial, Everett was employed with the U.S. Post Office and had a gross salary of approximately $35,000 per year. He has completed two years of college. After Deborah forced Everett to leave the house in 1994, he worked at an additional job so that he could support Deborah and the three children. He testified that he worked from 8:30 a.m. until 11:00 p.m. Deborah is not employed. She worked for a time as a rural mail carrier, but was involved in an accident. Following the accident, Deborah refused to be examined by the postal services' doctor, as required by the statute, and eventually was terminated. An attorney was hired, who got Deborah reinstated, but she refused to return to her job.

¶4. Deborah did not appear in court for the trial in this matter, although the chancellor ascertained that Deborah was well aware of the hearing. The hearing went forward before the chancellor. Deborah's attorney was present, and cross-examined Everett and the two older daughters, both of whom testified at length. Documents and financial data were admitted into evidence.

¶5. The testimony and evidence showed that Deborah sat in front of the television set all day long watching QVC, the "home shopping" network, and purchased many items. She ran up large telephone bills, including one call to the "psychic friends" network for $500 for a single call. The telephone company eventually disconnected the telephone. In an effort to keep up with the bills, Everett worked two jobs, paid Deborah $500 every two weeks, made the second mortgage payment on the house of $350, paid Deborah's car note, and paid off a signature loan at the credit union made to Deborah, yet Deborah's expenses far exceeded Everett's ability to provide. Deborah did not make the first mortgage payment on the house during the separation, and at the time of the divorce hearing, the house had been foreclosed. The purchaser was in the process of beginning eviction proceedings.

¶6. Testimony was presented to the chancellor that physical violence took place in front of the children. Deborah hit Everett, and Everett hit Deborah. The children corroborated this as well as Everett. Further, Deborah, during the marriage, constantly accused Everett of adultery, and accused him of sexually molesting the two older daughters. Deborah asked Everett how it felt to have sexual intercourse with the oldest daughter in her presence. Both children testified at the hearing that their father had never touched them in an inappropriate manner, that he took them to church, and took them shopping for school clothes, etc. The girls and Everett testified that after the washing machine developed problems, Deborah stopped washing clothes, and the carport floor was covered with dirty clothes. Everett took clothes to the laundromat when he visited, but Deborah would not allow him to visit often, and he was allowed to visit for only a short period of time. The girls testified that when Everett attempted to visit, and before the separation, their mother cursed their father with unprintable epithets. The girls testified that Deborah did not cook, but sometimes took them to a fast food drive-through to purchase food. Testimony was that the kitchen was "disgusting." The girls stated they

each had an alarm, set the alarm, and got themselves off to school either by walking or riding bicycles.

¶7. Everett visited a psychiatrist who prescribed an antidepressant. He testified that Deborah's actions caused him to lose his temper, and he went to the psychiatrist to get this problem under control. Everett did not have a problem with his temper under any other circumstances or with other people.

¶8. Everett testified that when the children were ill, Deborah would not take them to a regular doctor, despite the fact that his insurance would have covered such a visit, but instead, took them to the nearest emergency room, even if the girls had only a cold. The chancellor in his ruling of the court stated that if Deborah continued this practice following the divorce, she would have to pay for such emergency room visits.

¶9. The chancellor, in the ruling of the court, found that Everett had proved the grounds for a divorce based on habitual cruel and inhuman treatment, and that the interests of the children would best be served by awarding physical custody of them to their father. He awarded the normal visitation rights to Deborah. The chancellor emphasized that the children should not be subjected to any more violence, and if the visitation exchange could not be peaceably made, the exchange would be set up at the police station.

¶10. The marital home was foreclosed, and the chancellor made note that Everett was going to have to provide a home and all expenses for himself and three daughters who were at an age where many expenses are incurred. He ordered Everett to provide medical insurance for Deborah for eighteen months and to finish paying for her automobile, which was awarded to her. The chancellor made a division of the household goods, and held Everett responsible for all the marital debts that had been incurred. He did not award alimony to Deborah, and noted that there was no evidence or indication that she could not be gainfully employed. There was testimony that her father lived in Biloxi, and could provide living quarters for Deborah, if the father chose to do so.

¶11. In summary, Deborah sat in front of the television set all day watching QVC. She did not answer the doorbell, no longer had a telephone, and refused to go anywhere or do anything except sit in front of the television set. She did not cook, clean, or attempt to care for her children. She spent all the money in her possession to purchase QVC items, rather than pay household expenses. Deborah shouted and cursed continuously at Everett when he was present, accusing him of adultery and incestuous child molestation in front of the children. Physical confrontations and violence took place in front of the children repeatedly. The children testified that they would prefer to live with their father. Despite the fact that Everett worked at two jobs while separated, and provided sufficient monies to Deborah, she failed to make the first mortgage payment on the house, which was foreclosed. Everett saw a psychiatrist and was prescribed antidepressants. He asserts that he was treated for medical anxiety as a direct result of Deborah's behavior.

¶12. The Court of Appeals in reversing and rendering held that:

> Most certainly, the Richard's marriage was turbulent, but the conduct cited by Mr. Richard does not sustain the ground of habitual cruel and inhuman treatment. Therefore, this Court reverses the trial court and denies the divorce on the ground of habitual cruel and inhuman treatment.

## ISSUE RAISED FOR CERTIORARI REVIEW

### I.

**WHETHER THE HOLDING BY THE COURT OF APPEALS IS CONTRARY TO *STARE DECISIS* AND IS A DEPARTURE FROM THE CASE LAW REGARDING HABITUAL CRUEL AND INHUMAN TREATMENT AS DEFINED IN THE PAST.**

### STANDARD OF REVIEW

¶13. In ***Rawson v. Buta***, 609 So. 2d 426, 429 (Miss. 1992), we held:

> This Court views the facts of a divorce decree in a light most favorable to the appellee, and may not disturb the chancery decision unless this Court finds it manifestly wrong or unsupported by substantial evidence. ***Mullins v. Ratcliff***, 515 So. 2d 1183, 1193 (Miss. 1987); ***Devereaux v. Devereaux***, 493 So. 2d 1310, 1312 (Miss. 1986); ***Fournet v. Fournet***, 481 So. 2d 326, 328 (Miss. 1985).

*See also* ***Chaffin v. Chaffin***, 437 So. 2d 384, 386 (Miss. 1983)("This Court will not reverse a chancellor's decree of divorce unless it is manifestly wrong as to law or fact."); ***Rawson v. Buta***, 609 So. 2d 426, 431 (Miss. 1992) ("The chancellor, as the trier of fact, evaluates the sufficiency of the proof based on the credibility of witnesses and the weight of their testimony.").

### HABITUAL CRUEL AND INHUMAN TREATMENT

¶**14.** In ***Daigle v. Daigle***, 626 So. 2d 140, 144 (Miss. 1993) this Court held:

> The ground of habitual cruel and inhuman treatment may be established by a preponderance of the evidence, rather than clear and convincing evidence, and the charge "means something more than unkindness or rudeness or mere incompatibility or want of affection." ***Smith v. Smith***, 614 So. 2d 394, 396 (Miss. 1993)(quoting ***Wires v. Wires***, 297 So. 2d 900, 902 (Miss. 1974)).

¶15. We further held in ***Rawson v. Buta***, 609 So. 2d 426 (Miss. 1992) that:

> Evidence sufficient to establish habitual, cruel and inhuman treatment should prove conduct that:

> either endanger[s] life, limb or health, or create[s] a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief or, in the alternative, be so unnatural and infamous as to make the marriage revolting to the offending spouse and render it impossible for that spouse to discharge the duties of the marriage, thus destroying the basis for its continuance.

> S. Hand, Mississippi Divorce, Alimony and Child Custody § 4-12 (2d ed. Supp. 1991) (citations); *see e.g.*, ***Parker v. Parker***, 519 So. 2d 1232, 1234 (Miss. 1988); *accord* ***Kergosien v. Kergosien***, 471 So. 2d 1206 (Miss. 1985); ***Marble v. Marble***, 457 So. 2d 1342 (Miss. 1984).

*Id*. at 431.

¶16. Further, "A causal connection between the treatment and separation must exist." ***Gardner v. Gardner***, 618 So. 2d 108, 114 (Miss. 1993)(citing ***Fournet v. Fournet***, 481 So. 2d 326, 328 (Miss. 1985)).

¶17. Contrary to the Court of Appeals' majority opinion, the circumstances, taken as a whole show that the chancellor did not err when he granted Everett a divorce from Deborah on the grounds of habitual cruel and inhuman treatment.[1] The facts in this case are unrebutted. Deborah did not appear for trial to contradict any of the accusations made against her by her husband. The unrebutted facts are that Deborah constantly accused her husband of having an affair, spent Everett's paycheck on items from QVC instead of paying the household bills, and caused the telephone bill to be excessive in amount, until it was finally disconnected because of inability to pay the bill. Deborah also repeatedly accused Everett of having an incestuous relationship with their fourteen-year-old daughter. As a result of Deborah's behavior, Everett sought help from a psychiatrist who prescribed for him Zoloft, an anti-depressant.

¶18. This Court has held that although divorce granted on the grounds of cruel and inhuman treatment is usually due to acts of physical violence or such acts that result in apprehension thereof, false accusations of infidelity, made habitually over a long period of time without reasonable cause also constitute cruel and inhuman treatment. ***Hibner v. Hibner***, 217 Miss. 611, 613, 64 So. 2d 756, 757 (1953).

¶19. The requirement of physical violence or threats of such for a claim of cruel and inhuman treatment to lie apply only when those are the acts alleged in the complaint. ***Id***. In the case at hand, there was physical violence, yet both parties were guilty of it, and it was not the major complaint.

¶20. The crux of Everett's complaint of cruelty lies more in the habitual, wrongful accusations of infidelity and incest rather than in physical abuse or fear of such. There is no mention in the COA opinion of the children's testimony [which took place with their father outside the courtroom], nor of the detrimental effect this marriage is having and would continue to have on these three minor children. Constant physical violence goes far beyond "turbulence." Additionally, there is a traumatic and detrimental effect on a fourteen year old girl from hearing her father accused on a continuing basis of raping and molesting her. The child testified as to these accusations and stated that the accusations were made upon no basis in fact. The father and the other minor child corroborated her testimony.

¶21. We hold that these accusations and proof thereof standing alone are extreme enough to constitute cruel and inhuman treatment. ***Id.*** Further, when all the things complained of are viewed as a whole, keeping in mind the habitual nature of the acts, they certainly amount to habitual cruel and inhuman treatment.

¶22. Additionally, we note that the COA stated, "Mr. Richard did not leave home because of any fear or concern for his physical or mental health, but because Mrs. Richard asked him to go." The divorce grounds of habitual cruel and inhuman treatment may be established by a showing of conduct that either (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance. ***Daigle v. Daigle***, 626

So. 2d 140, 144 (Miss. 1993). In the case sub judice, we also find that, it is rather obvious, why Everett left home, considering all things complained of as a whole. Deborah's actions were "so unnatural and infamous as to make the marriage revolting to [Everett] and thus rendered it impossible to discharge the duties of marriage, thus destroying the basis for its continuance." *Id.* Neither Everett, nor his children could continue to live in this deplorable situation. In *Faries v. Faries,* 607 So. 2d 1204 (Miss. 1992), where this Court reversed the chancellor's denial of a divorce "solely on the basis of an absence of evidence suggesting that cruelty proximately caused the separation," we explained:

> Further elucidation of the issue presently before the Court comes from *Fournet v. Fournet*, 481 So. 2d 326 (Miss. 1985), wherein it was held that a spouse seeking divorce on the ground of habitual cruel and inhuman treatment must offer proof as to causal connection between cruel treatment complained of and spouse's separation from household. *Id.* at 329. The proximate cause rule of *Fournet* was limited a year later in *Bias v. Bias*, 493 So. 2d 342 (Miss. 1986). There the Court recognized that the conduct of one separated from her spouse may constitute habitual cruel and inhuman treatment.
>
> Absence of proof of proximate cause does not in logic negate the reality of habitual cruel and inhuman treatment, which may indeed have been a proximate cause of harm to the health and physical well being of the plaintiff (as distinguished from the actual cause of the separation). The chancellor's primary inquiry must in justice be into the ground for divorce. That inquiry requires a dual focus: upon the conduct of the offending spouse and the impact of that conduct upon the plaintiff. If the requisite impact upon plaintiff is proved, there is little reason why we should arbitrarily dismiss because of the proximate cause of separation rule which no legislature has mandated.

*Faries,* 607 So. 2d at 1209 (quoting *Bias,* 493 So. 2d at 345). *See also McKee v. Flynt,* 630 So. 2d 44, 48 (Miss. 1993)(same); *Hyer v. Hyer,* 636 So. 2d 381, 384 (Miss. 1994)(recognizing limits on "proximate cause of separation" requirement and finding that where both parties are guilty of cruel and inhuman treatment, chancellor must look to whose conduct was "the proximate cause of the deterioration of the marital relationship and the divorce itself.").

¶23. We no longer require that a specific act must be the proximate cause of a separation before a divorce may be granted on grounds of habitual cruel and inhuman treatment. It is, instead, habitual or continuous behavior over a period of time, close in proximity to the separation, or continuing after a separation occurs, that may satisfy the grounds for divorce. In this case, Deborah Richard's unfounded accusations against her husband and other behavior before she asked him to leave as well as after the separation satisfied the requirements for a divorce on grounds of habitual cruel and inhuman treatment.

## II.

### THE ISSUES OF ALIMONY AND DIVISION OF MARITAL PROPERTY, NOT ADDRESSED BY THE COA, BUT RAISED ON APPEAL BY DEBORAH.

¶24. Deborah complained on appeal that the chancellor erred in failing to award her alimony, and erred in the division of marital property. Although the Court of Appeals did not address these issues,

it would be appropriate to review these matters.

¶25. In this case, the husband must provide a home, medical care, and child support for a family of four--himself and three children. He is responsible for their medical insurance. The family home was foreclosed, so there was no division to be made of that domicile. The chancellor awarded to the husband family furniture which the husband had inherited from his family, the children's bedroom furniture, and household goods required to provide a household for the children. The husband is to maintain medical insurance on the wife for eighteen months, to make the wife's automobile payments, and to pay off all the marital debts incurred while the couple was still married. This did not include extraordinary expenses incurred by Deborah alone after the separation which had no relation to the children, household, or Deborah's well being. Deborah had been employed as a rural mail carrier until an accident occurred, and when reinstated at her job, simply refused to go back to work. The chancellor felt that she was capable of being gainfully employed.

¶26. The standard of review of an alimony award, or lack thereof, is that it is within the discretion of the chancellor and should not be reversed unless the chancellor was manifestly in error. *Ethridge v. Ethridge*, 648 So. 2d 1143, 1145- 46 (Miss. 1995).

¶27. The car note on Deborah's car totaled $9,200, and the marital debts were consolidated through Everett's credit union, and he must pay the monthly amount of $655.75. He must also maintain medical insurance on her for eighteen months, and she was given a share of the household goods, including the bedroom furniture, necessary for living in a place of her own. The wife, following her work related injury received workers' compensation benefits, but these were discontinued because she refused to have an independent medical examination. Although Everett states that Deborah complained of a "pinched nerve," there is no medical verification of this fact, as she refuses to see a doctor. Pursuant to *Armstrong* v. *Armstrong*, 618 So. 2d 1278 (Miss. 1993), the relevant facts support the finding of the chancellor. Additionally, a review of the factors set out in *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994) would show that the chancellor was well within his discretion and correctly applied prevailing law in his division of marital assets. This issue is without merit.

## CONCLUSION

¶28. This Court is to reverse the chancellor's ruling only where there was manifest error and a lack of substantial evidence to support the judgment. *Daigle v. Daigle*, 626 So. 2d 140, 144 (Miss. 1993). In the instant case, there is an abundance of uncontroverted substantial evidence to support the judgment, and we find no manifest error on the part of the chancellor. We have held that the chancellor's "[i]nquiry requires a dual focus: upon the conduct of the offending spouse and the impact of that conduct upon the plaintiff." *Faries,* 607 So. 2d at 1209 (quoting *Bias,* 493 So. 2d 342, 345 (Miss 1986). Here, it is obvious from the evidence that Deborah's conduct in the marriage was so revolting to Everett and affected the children to "render it impossible for [Everett] to discharge the duties for its continuance." *Daigle v. Daigle*, 626 So. 2d at 144. The chancellor's grant to Everett of a divorce on the grounds of habitual cruel and inhuman treatment is affirmed.

¶29. THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CHANCERY COURT IS REINSTATED.

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, McRAE, ROBERTS, MILLS AND WALLER, JJ., CONCUR.**

1. Diaz, J., dissenting in separate opinion, joined by Thomas, P.J., and Payne, J. correctly analyzed the case *sub judice*.